676 So.2d 131 (1996)
Gary W. CROSS, Individually and on Behalf of His Minor Son, Darren Bradley Cross and Karen Cross
v.
CUTTER BIOLOGICAL, A DIVISION OF MILES, INC., Armour Pharmaceutical Company, The Administrators of the Tulane Educational Fund, Tulane University School of Medicine, et al.
No. 94-CA-1477.
Court of Appeal of Louisiana, Fourth Circuit.
May 29, 1996.
Rehearing Denied July 26, 1996.
*135 Mull & Mull, Thomas Wilson Mull, Lorraine S. Mull, Covington, for Plaintiffs/Appellants.
Chaffe, McCall, Phillips, Toler & Sarpy, Charles L. Chassaignac, Jonathan C. McCall, Mary L. Meyer, Douglas L. Grundmeyer, New Orleans, Fulbright & Jaworski, Terry O. Tottenham, Austin, Texas, for Defendant/Appellee Miles Inc.
Montgomery, Barnett, Brown, Read, Hammond & Mintz, James B. Irwin, Robert E. Durgin, Kim E. Moore, New Orleans, Sidley & Austin, Douglas F. Fuson, Sara J. Gourley, Chicago, Illinois, for Defendant/Appellee, Armour Pharmaceutical Company.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre Stewart E. Niles, Patricia A. Bethancourt, Virginia W. Gundlach, New Orleans, for Defendants/Appellees, Dr. Andes and The Administrators of the Tulane Education Fund d/b/a Tulane Medical Center Hospital & Clinic.
Before BARRY, CIACCIO and PLOTKIN, JJ.
BARRY, Judge.
Gary and Karen Cross' son was a hemophiliac who contracted AIDS through a contaminated blood derivative prescribed for his hemophilia. The Crosses appeal a jury verdict in favor of Miles, Inc. (successor to Cutter Laboratories), Dr. Abe Andes, and Tulane University School of Medicine. The Crosses also appeal a directed verdict in favor of Armour Pharmaceutical Company. Miles and Armour answered the appeal.

Background
Darren Bradley Cross (Brad) was born in April 1975 with hemophilia, an inherited blood disorder. Brad's blood was deficient in *136 Factor VIII, a blood clotting agent required for proper coagulation, and he was classified as a severe hemophiliac. Brad's mother Karen Cross testified the hemophilia caused Brad to bleed internally. The bleeding was controlled with cold compresses and infusion of Factor VIII concentrate which was prescribed by Brad's physicians.
Factor VIII concentrate is commercially prepared as a derivative of blood plasma which contains proteins for clotting. Commercially manufactured Factor VIII concentrate became available in 1974 for treatment of bleeding episodes, which allowed home infusion and prolonged the patient's average life span from sixteen years to normal.
Carol Moore, Director of Regulatory Affairs for Cutter, testified that blood is collected from a donor, the plasma is separated from the red blood cells, and the red blood cells are returned to the donor. Plasma from thousands of donors is pooled to produce Factor VIII. Hematologist Dr. Louis Aledort explained that Factor VIII is fractionated from a precipitant of frozen blood plasma known as cryoprecipitate which contains high levels of Factor VIII. Biochemist Milton Mozen, an expert in the manufacture and processing of Factor VIII, explained that cryoprecipitant is placed in a centrifuge and Factor VIII is separated and freeze dried. The patient dissolves the freeze-dried Factor VIII blood derivative and infuses it to control bleeding.
Defendants Armour Pharmaceutical and Miles, Inc. (or Cutter Laboratories) are manufacturers of Factor VIII and cryoprecipitate. Other fractionating companies such as Alpha Therapeutic Corporation and Baxter prepare Factor VIII but were not made defendants.[1] Alpha, Armour, Baxter, and Miles were regulated by the Federal Drug Administration (FDA) which set minimum standards for plasma collection and the manufacture of blood component products.
The testimony shows that Brad received Factor VIII infusions since he was at least a year old. In 1980 Brad joined a program for hemophilia patients at the Comprehensive Hemophilia Care Center at Tulane Medical Center. Brad's treating physician, Dr. Abe Andes, testified that the Center advised the patients to return every six months.
Staff members at Tulane's hematology lab routinely collected blood samples from Brad and performed blood tests such as blood count and coagulation studies. Other routine studies were performed at Tulane's clinical immunology lab one to three blocks away on Perdido Street. Plasma which was not used in the routine tests was labeled, frozen and stored for potential future studies.
Brad visited the clinic on December 29, 1981, December 14, 1982, June 12, 1984, and periodically thereafter. Brad did not visit the Center in 1983 and the Center did not have a 1983 sample.
Defendant Dr. Andes is a physician at Tulane Medical Center and was director of the Comprehensive Care Center from 1977 to 1992. Dr. Andes was Brad's treating physician from 1980 to 1989 and prescribed Factor VIII to Brad. Karen Cross testified that Brad's pediatrician Dr. Heflin (who was not associated with the Center) sometimes prescribed Factor VIII.
Karen and Gary Cross were members of the National Hemophilia Foundation (NHF), an informational support group for hemophiliacs and their families. Gary is on the NHF board. The NHF published Medical Bulletins to the medical community and Patient Alerts and Chapter Advisories to lay members. Dr. Andes was a member of the Medical and Scientific Advisory Counsel (MASAC) to the NHF.
In 1981 the Centers for Disease Control (CDC) in Atlanta published a report on a newly discovered disease which later became known as acquired immune deficiency syndrome (AIDS). AIDS is the name of the syndrome; the virus which causes AIDS (human immunodeficiency virus or HIV) was not yet discovered. AIDS was characterized as a depressed immune system and emergence of opportunistic infection in the patient. Groups identified as being at high risk for AIDS were homosexual males, intravenous drug users, and Haitians. The FDA identified *137 New York City, San Francisco, Los Angeles, and Miami as high risk "hot spots."
On July 16, 1982 the CDC reported in its publication Morbidity and Mortality Weekly Report (MMWR) that three hemophiliacs in this country were diagnosed with pneumocystic carinii pneumonia, an opportunistic infection associated with severe immune dysfunction. That report stated the cause was unknown and occurrence among three hemophiliacs "suggests the possible transmission of an agent through blood products." Dr. Jay Levy studies viruses and immune dysfunction and testified that the scientific community at that time also considered the possibility that the immune deficiency in those hemophiliacs was caused by something other than a transmissible agent.
The NHF's Patient Alert No. 1 disseminated information on the three hemophiliac patients on July 14, 1982 and noted that the CDC did not recommend a change in treatment for hemophiliac patients. Dr. Aledort testified that scientists met in July 1982 to explore the disorder and whether the three hemophiliacs had the same disease. On December 21, 1982 the NHF distributed Advisory No. 5 which informed readers that the number of hemophiliac patients with AIDS had risen to eight. That advisory recommended no change in treatment of patients whose therapy included factor concentrates such as Factor VIII:
And, by all means, one should not withhold the use of clotting factor therapy when needed.
Dr. Aledort testified that in December 1982 there was no known common "lot" of Factor VIII between the infected hemophilia patients. Dr. Aledort testified that in December 1982 it was reasonable to discuss a possible association between AIDS and blood products but it was not reasonable to assume that blood products caused AIDS. He testified that in December 1982 the benefits of Factor VIII outweighed the risks.
While patterns in the AIDS patient population developed, the scientific and medical communities searched for the agent which transmits the disease. Blood and bodily secretions were the suspected media for transmission of the disease. However, Dr. Aledort testified that in October 1983 the medical community did not know Factor VIII concentrate transmitted the agent responsible for AIDS.
A French scientist isolated the virus responsible for AIDS in late 1983; Dr. Levy and Dr. Robert Gallo isolated the virus in this country in late 1983 and in 1984, respectively. Originally termed HTLV-III, the virus eventually became known as HIV. There was no consensus among scientists until January 1984 that HIV is blood borne. A test to detect the virus in blood had not been developed by 1984.
In October 1983 Cutter learned that a donor whose plasma might have been used in its factor concentrate died of AIDS four to five weeks after that donor's last donation in September 1983 at a collection center in Austin, Texas. On October 31, 1983 Cutter voluntarily withdrew from the market all of its Factor VIII which was potentially contaminated by that donor's plasma. Jo Ann Patin of the Comprehensive Care Center notified the Crosses in writing and by telephone. The evidence shows Brad had infused six vials of Factor VIII from the withdrawn lots. At that time there was no test to detect the presence of HIV in the factor concentrate, so the withdrawn product could not be tested for contamination.
In March 1985 the ELISA test was developed and licensed to detect the presence of HIV antibodies in the blood. Dr. Andes ordered ELISA tests on Brad's frozen samples in June 1985. The ELISA tests were performed at Tulane's clinical immunology lab within three blocks of the hematology lab where the blood was collected from the patient.
Dr. Andes testified on direct examination by plaintiffs' counsel that the ELISA test was negative for Brad's December 29, 1981 sample and positive for Brad's December 14, 1982 and June 14, 1984 samples. He testified without objection by plaintiffs that a confirmation test showed Brad's 1982 and 1984 samples were positive. Medical Technologist Constance Porretta testified without objection that she packaged and sent Brad's 1982 and 1984 samples to a Baltimore laboratory *138 for the Western Blot test which confirmed the positive results.
There is no 1983 sample because Brad did not visit the clinic that year. Brad developed AIDS in 1989 and died April 16, 1993.
The Crosses filed suit on May 21, 1991 individually and on behalf of Brad. Defendants are Cutter (a division of Miles), Armour, Dr. Andes, and Tulane Educational Fund d/b/a Tulane Medical Center Hospital and Clinic. After Brad died Gary and Karen Cross were substituted as party plaintiffs in Brad's survival action and they amended the petition to allege wrongful death.[2] The Crosses alleged negligent processing of the factor concentrate, failure to properly screen plasma donors, failure to properly test for the virus, failure to inform and warn of the risks, breach of implied warranties, and malpractice. The defendants filed exceptions of prescription which the trial court referred to the merits. The court did not rule on the prescription issue.
The trial court entered a directed verdict in favor of Armour. The court stated in a per curiam that in late 1985 and early 1986 Brad received two lots of Factor VIII manufactured by Armour. Those lots were recalled but there was no evidence they were contaminated with HIV. The per curiam also notes that although Armour's Factor VIII contained a protein that might "irritate" Brad's condition, proteins other than HIV were not at issue per the pleadings.
The jury rendered a verdict in favor of the remaining defendants. In its interrogatories the jury found that Brad seroconverted (developed antibodies to HIV which caused a positive ELISA test) on or before December 14, 1982, and Brad infused Cutter Factor VIII that was contaminated with HIV but the Cutter Factor VIII did not cause Brad's HIV infection. The jury apparently concluded that Brad was infected before he infused the contaminated Cutter product which did not aggravate his condition. The jury further found that Dr. Andes did not breach the standard of care in his treatment of Brad.

Assignments
The first five assignments of error address evidentiary rulings by the trial court. Assignment six argues the directed verdict in favor of Armour was improper, and assignment seven addresses the trial court's jury charge concerning the relationship between Dr. Andes and Cutter.
Miles and Armour answered the appeal based on prescription. In the event this Court reverses on the merits, Miles and Armour seek a remand for completion of the evidentiary hearing on the exception and for a ruling from the trial court on the prescription issue.

Chain of Custody
The Crosses contend the chain of custody for the ELISA and Western Blot blood tests on Brad's December 14, 1982 blood sample was not established and testimony and evidence of those test results were improperly admitted. The Crosses argue the persons who collected the blood and transported the sample to Tulane's clinical immunology lab for ELISA testing were not identified; the person who placed a numerical code on Brad's sample was not identified and the "code book" that correlated the numerical code with the patient was not produced until trial; the sample was not properly preserved; and the person who performed the Western Blot test to confirm the positive ELISA test result did not testify. The Crosses do not contest admissibility of the ELISA test results for Brad's 1981 or 1984 samples or the Western Blot test on the 1984 sample, although the evidence surrounding collection and testing of those samples is similar to the 1982 sample. The Crosses attempted to show that Brad was infected in 1983 by infusion of the Cutter Factor VIII which was subject to Cutter's October 1983 market withdrawal. Therefore plaintiffs only object to the 1982 test result showing that Brad was infected prior to his infusion of Cutter Factor VIII in 1983.
*139 The Crosses first argue that the court erroneously allowed several witnesses to testify that the ELISA and Western Blot tests which were performed in June 1985 showed Brad's December 14, 1982 blood sample was positive for HIV antibodies. The Crosses complain that a proper foundation was not made prior to testimony and argument of counsel concerning the test results. That argument has no merit.
A party may waive or be estopped from making an objection to the admission or exclusion of evidence. That waiver may arise from failure to object, from an act done or omitted before evidence is offered, or from some affirmative act done after the court's ruling on the evidence. Combs v. Hartford Insurance Co., 544 So.2d 583, 585-86 (La. App. 1st Cir.), writ den. 550 So.2d 630 (La. 1989).
Counsel for Dr. Andes and TMC stated during his opening statement that the ELISA test for Brad's December 1982 sample was positive, and Dr. Andes and Ms. Porretta testified that Brad's 1982 sample tested positive. Objection to defense counsel's statement and the witnesses' testimony was waived because during his opening statement plaintiffs' counsel was the first to disclose to the jury the existence of a positive test result on Brad's 1982 sample:
(T)he evidence will be presented that he [Brad] got this [HIV] in 1982, in December 1982; that there was a blood test that will show he had it. I say so be it. Look at the validity of the blood test based on the evidence presented and you will find that it is unreliable....
Moreover, plaintiffs' counsel was the first to elicit from Dr. Andes' that Brad's December 1982 sample tested negative for HIV, and Brad's December 1982 and June 1984 samples tested positive:
Q. [By Counsel for Plaintiffs]
Well, so he first tested positive not in 1982?
A. His first test sample, we have gone through, I think, the samples that I mentioned to you, we had saved from 1980 on. The boy had plasma left over from samples we drew of blood beginning in 1982, 1981. We tested in '81, '82, '84, 85 samples. The first of those samples done later now, this is now done in 1985, the first one to become positive was 1982. So in '81 he was negative, December of '81; in December of '82, a year later, five months after anybody knew anything about AIDS and hemophilia, he had already become infected. He was already infected tragically before we knew one word about AIDS and hemophilia. We know now. Of course, we didn't know until '85 at that time.
By placing the test results before the jury, plaintiffs waived their objection to testimony concerning those results.
Dr. Andes testified on cross examination that the confirmatory test known as Western Blot showed Brad's December 29, 1981 sample was negative for HIV, December 14, 1982 sample was positive, and June 14, 1984 sample was positive. Ms. Porretta, the medical technologist who packaged and sent Brad's 1982 and 1984 samples to Baltimore for the confirmatory tests, said the Western Blot confirmed the positive results. Significantly, counsel for plaintiffs did not object and therefore waived objection to that testimony. Counsel's continuing objection to testimony and evidence of Ms. Porretta's worksheets on the ELISA test results (based on insufficient predicate) did not constitute an objection to the testimony concerning the Western Blot tests.
The Crosses also argue that documentary evidence of the ELISA test results was improperly admitted. The Court admitted into evidence the worksheets of the lab technician (Ms. Porretta) who performed the ELISA test showing that Brad's 1982 sample was positive. There is no documentary evidence of the Western Blot test results.
La.C.E. art. 901 provides requirements for authentication of a document:
A. General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. [Emphasis added.]
An exception exists where a blood test result is part of a medical record which *140 is admitted into evidence under La.R.S. 13:3714. The Supreme Court has held that blood alcohol test results contained in medical records are admissible under the medical records exception and do not require independent authentication. Judd v. State, Department of Transportation & Development, 663 So.2d 690, 696.(La.1995). Defendants argue the medical records exception applies.
La.R.S. 13:3714 requires proper certification of the medical records:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents.... [Emphasis added.]
The ELISA test results are not in Tulane's medical records which were certified and admitted into evidence. The certified Tulane records repeatedly note that Brad is HIV positive; some reports state he was diagnosed in 1984, some state 1985. Those records do not contain the ELISA test results on his December 1982 blood sample, and the test results were not independently certified. The medical records exception does not apply. Therefore, a proper foundation is required for admission of those test results into evidence.
The initial authentication decision as to admissibility is made by the trial judge using Art. 901's standard of "evidence sufficient to support a finding that the matter in question is what its proponent claims." La. C.E. art. 901, comment (c) to Paragraph A. See La.C.E. art. 104, comment (c), which cites Art. 901 as an exception to the preponderance of the evidence standard. If the trial judge determines that the item is sufficiently genuine and its admission could assist the trier of fact, the factfinder ultimately determines whether the evidence is genuine. G. Pugh, G. Rault, Jr., and K. Triche, Handbook on Louisiana Evidence Law, Author's Notes, pp. 477-79.
Despite the standard in Art. 901, some Louisiana jurisprudence holds that admissibility is determined by a preponderance of the evidence, a stricter standard than the standard established in Art. 901(A) ("sufficient to support a finding").
McLaughlin v. Fireman's Fund Insurance Co., 582 So.2d 203 (La.App. 1st Cir.), reh. granted on other grounds, writ den. 586 So.2d 536 (La.1991), held that admissibility must be proved by a preponderance of the evidence:
The admissibility of evidence is a question of law determined by the court. See cases cited in Comment (a) for La.C.E. art. 104. When factual questions must be decided to determine the admissibility of evidence, the court should follow the preponderance of evidence standard, unless a special rule of law requires a different standard.
McLaughlin, 582 So.2d at 207.
A number of cases from this Circuit hold that the chain of custody must be proved by a preponderance of the evidence. George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097, 1107; Segura v. Louisiana State Racing Com'n, 577 So.2d 1031, 1033 (La.App. 4th Cir.1991). George and Segura cite Laborde v. Louisiana State Racing Com'n, 560 So.2d 594, 597 (La.App. 4th Cir.1990), which held that the chain of custody in that case was established by an overwhelming preponderance of the evidence.
We note the conflict between the statutory and jurisprudential standards of proof. We need not resolve the conflict in this case because the foundation for the ELISA test results on Brad's 1982 sample was sufficient for admission under either standard.
The party seeking to introduce evidence of a blood test must lay the proper foundation by showing a connection between the specimen and the source, that the specimen was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. George v. Department of Fire, 637 So.2d at 1106; Ober v. CUNA Mutual Society, 26,208 (La.App. 2 Cir. 10/26/94), 645 So.2d 231, 235.
The purpose of the chain of custody rule is to preserve the integrity of the evidence *141 and to protect from tampering or loss. Judd v. State, Department of Transportation & Development, 95-1052 (La. 11/17/95), 663 So.2d 690, 694; Recasner v. Department of Fire, 94-0815 (La.App. 4 Cir. 11/17/94), 645 So.2d 1291, 1293, citing Segura v. Louisiana State Racing Com'n, 577 So.2d at 1033. Twenty-four hour vigilance of the evidence is not required in a civil case. Recasner, 645 So.2d at 1293, citing LaBella v. Louisiana State Racing Com'n, 569 So.2d 58, 61 (La. App. 4th Cir.1990), writ den. 572 So.2d 67 (La.1991).
In LaBella v. Louisiana State Racing Commission, supra, this Court allowed into evidence the test results on a urine sample where there was no evidence tracking transportation of the specimen between the bus station in Baton Rouge and the lab in Lafayette. Because the container was sealed and evidence showed proper collection of the sample, the results were admissible. Brasseaux v. State Racing Com'n, 577 So.2d 324 (La.App. 4th Cir.), writ den. 580 So.2d 670 (La.1991) held that a urine specimen was properly admitted despite the lack of evidence as to transportation of the sample where the evidence established the identity of the persons responsible for taking and testing the specimen and the specimen was sealed and tamper-proof.
LaBella distinguished Bufkin v. Mid-American Indemnity Co., 528 So.2d 589 (La. App. 2d Cir.1988) because the person who drew the blood in Bufkin was unknown and there was no evidence to link the tested blood with the defendant.
The Crosses argue that the only evidence to link Brad's coded test results to Brad's sample is the lab workbook which correlates each patient with a numerical code that was assigned to preserve the confidentiality of HIV test results. The Crosses argue the code book is inadmissible because the defendants did not produce it during pre-trial discovery. That argument has no merit.
Copies of the pertinent pages from the code book were produced during discovery, and the trial court stated that the pertinent pages were part of a defense exhibit which was in the judge's chambers prior to trial. Plaintiffs were not prejudiced and the record does not show that the defendants wilfully withheld documents. Cf. Horton v. McCary, 93-2315 (La. 4/11/94), 635 So.2d 199, 204, which states, "Criteria to be considered in imposing any sanctions [for failure to comply with a discovery order] are the prejudice to plaintiffs and the willfulness of defendants."
The Crosses argue that the person who collected Brad's 1982 blood sample was not identified. There is no evidence to identify the person who collected Brad's 1982 blood sample. Admitted into evidence was a copy of the peripheral blood study results performed on December 14, 1982 in the hematology clinic where the sample was collected. That report identifies Carol DeKernion as the person who performed those tests but does not identify who collected the blood. Dr. Andes testified that Brad's 1982 sample was collected by one of three persons at the Comprehensive Hemophilia Care Center: lab technicians Suzanne LeClere or Carol DeKernion, or nurse Karen Wulff. Suzanne LeClere, certified medical technologist for Tulane for twenty-six years, and Carol DeKernion, a medical technologist for thirty years, corroborated that testimony.
DeKernion testified to the routine procedure for collecting blood from hemophilia patients at the Center. The blood was collected, the sample labeled with the patient's name and date of collection, and the sample was frozen.
Dr. Andes testified that LeClere, DeKernion, and Dr. Andes are the only persons who handled Brad's 1982 sample until 1985. He said he ordered the ELISA test when it was licensed in 1985 and samples were hand-carried to the Perdido Street lab because the Center "did no shipping or sending or anything like that."
Constance Porretta is an expert in immunological testing and technology and began working at TMC's clinical immunology lab in 1983. Porretta testified as to routine procedures for blood tests of hemophilia patients at the Comprehensive Care Center. The initial blood studies were performed at the hematology lab and the blood samples were routinely sent for further studies to *142 Tulane's clinical immunology lab on Perdido Street. Porretta identified a lab worksheet which showed Brad's sample was received by the clinical immunology lab on Perdido Street and routine tests were performed there on December 14, 1982. That worksheet was admitted into evidence but cannot be found in the appeal record. There is no evidence that Brad's 1982 sample was sealed for delivery to Perdido Street or who delivered it.
Porretta performed the ELISA test on Brad's 1981, 1982 and 1984 samples. Porretta testified that between 1982 and 1985, Brad's 1982 sample remained labeled with Brad's name and frozen at minus 70 degrees in the freezer of the clinical immunology lab on Perdido Street. It was thawed once in 1983 for one test and then refrozen.
In June 1985 Dr. Andes ordered the ELISA test on Brad's most recent stored samples. Brad's 1984 sample was coded at the hematology lab and sent to the lab on Perdido Street for the test. Porretta testified that Brad's 1982 sample had been stored in the Perdido lab and was not among the coded samples she received in 1985 from the hematology lab.
Porretta testified that in June 1985 she retrieved Brad's 1982 sample from the Perdido Street lab freezer and it was labeled with Brad's name and the date December 14, 1982. Porretta assigned to that sample the code number HP023. She performed the ELISA test on Brad's 1981, 1982, and 1984 samples. She testified the 1981 sample was negative, the 1982 and 1984 samples were positive.
Porretta explained the ELISA test procedure in detail and her worksheets were admitted into evidence over the objection of plaintiffs' counsel. Porretta testified that repeated thawing and refreezing might affect the sample, but Brad's 1982 sample was thawed only once in 1983. There is no testimony or evidence that the ELISA test is affected by thawing the sample one time.
We have found no cases directly on point. Though there is no evidence to identify which individual drew the blood, the testimony shows that it was collected by one of three authorized persons at the Comprehensive Care Center, labeled with Brad's name, and tested for routine studies. The testimony shows that further routine studies were performed on the sample in Tulane's Perdido Street lab that day. There is no evidence to identify the person who carried the blood to the Perdido Street lab or that the sample was properly sealed for transport. However, the testimony shows that only lab personnel handled the sample. The residual 1982 sample was stored in the Perdido lab freezer until 1985 when the ELISA test was performed.
Considering DeKernion's testimony as to the collection procedures, that the sample was frozen at minus 70 degrees from 1982 to 1985 (except once in 1983 when it was thawed for a test), and that only authorized lab personnel handled the sample prior to 1985, we conclude that the trial court did not err by admitting the test results into evidence. Moreover, any error in admitting the test results was harmless because the record contains other evidence of the probable date Brad was infected.
As shown above, counsel for plaintiffs first put positive test results before the jury in the opening statement and during testimony of Dr. Andes. Plaintiff's counsel did not object to testimony that the Western Blot test was positive on Brad's 1982 and 1984 samples. Thus, the weight afforded to that testimony was for the jury to determine.
Dr. William Robinson, expert in infectious diseases, testified that absent a serologic test, other indicators of the probable date of HIV infection include the quantity of Factor VIII the patient infused in a given year, whether the patient suffered an acute illness, and the patient's CD4 (T-Cell) count. Dr. Louis Aledort explained that CD4 cells fight infection with CD8 suppressors and the ratio of those cells is vital.
Dr. Aledort and Dr. Roy Benjamin Dawson, expert in hematology and blood banking, testified that Brad's 1982 T-Cell ratio was consistent with HIV infection, although Dr. Dawson said it was not diagnostic and Brad's infusion of the withdrawn Cutter product indicates he seroconverted after October *143 1983. Dr. Robinson testified that Brad's CD4 count in August 1986 was consistent with HIV infection both before and after December 1982.
Dr. Andrew Tobias Pavia, expert in internal medicine and infectious disease, testified that the risk of initial exposure to HIV can be correlated with the number of Factor VIII vials the patient infuses. Dr. Robert Remis, expert in epidemiology and public health, calculated based on Brad's records that Brad infused the greatest number of Factor VIII units in 1982. He calculated the total units infused in 1981 was 18,850; in 1982, 33,660; in 1983, 27,792; in 1984, 24,073. Dr. Robinson initially opined that there was less than ten percent probability that Brad seroconverted before December 1982, but his opinion was based on an incorrect calculation of the number of units Brad received. Dr. Robinson altered his opinion to under a fifty percent chance that Brad was infected before December 1982. Dr. Robinson acknowledged a scientific study which showed a median seroconversion date of April 1982 among hemophiliacs who infuse between 20,000 and 50,000 units each year.
Dr. Andes testified that the majority of hemophiliacs seroconverted by the end of 1982. Dr. Pavia testified that most were infected between 1980 and early 1983. Dr. Aledort testified that fifty percent of hemophiliacs in this country were infected by January 1982, and nearly ninety percent were infected by January 1983.
Considering the testimony and evidence that Brad was infected by January 1983, plaintiffs were not prejudiced by the introduction of the ELISA test results on Brad's December 1982 sample.

Judgment Notwithstanding the Verdict
The trial court denied the Crosses' motion for a judgment notwithstanding the verdict. Mr. and Mrs. Cross argue that testimony and evidence concerning the test results on Brad's 1982 sample was inadmissible and unreliable and the record does not establish Brad was infected prior to his infusion of Cutter products.
A JNOV is proper only if the evidence points so strongly in favor of the plaintiffs that reasonable persons could not have reached a different conclusion. Taylor v. American Laundry Machinery, Inc., 27, 121 (La.App. 2 Cir. 6/23/95), 658 So.2d 288, 296, writ den. 95-1877 (La. 11/3/95), 661 So.2d 1385. Considering the testimony and test results and that there is other evidence that Brad seroconverted prior to December 1982 (prior to his infusion of the Cutter Factor VIII withdrawn from the market), the evidence in opposition to the motion is of such weight and quality that a reasonable fair-minded individual might conclude that Brad seroconverted by December 1982 prior to infusion of the withdrawn Cutter product. Id. The trial court properly denied the JNOV.

Evidence of Federal Court Pleading
The trial court held inadmissible a complaint filed October 21, 1985 against Austin Blood Components, Inc. in the United States District Court for the Western District of Texas. The Crosses argue that allegations in the original complaint are relevant and constitute prior inconsistent statements and judicial admissions.
The original complaint was captioned Cutter Laboratories, Inc., Miles Laboratories, and Rhinechem Corp. v. Austin Blood Components, Inc. and Edward R. Geagan, M.D. Miles is the successor to the plaintiff companies. The complaint alleged that Austin Blood Components sold to Cutter, Miles, and Rhinechem contaminated plasma for the manufacture of Factor VIII, that the plaintiffs learned of the infected plasma and recalled all shipments of Factor VIII manufactured from the infected plasma, and that they sustained a loss. The complaint alleged the infected donor was a homosexual who "donated blood on nearly forty-eight ... occasions between November 18, 1982 and September 16, 1983," that Austin Blood Components knew or should have known the donor was at risk for AIDS, and that plaintiffs confirmed that the donor had AIDS when he died.
Miles opposed admission of the complaint into evidence because Miles did not authorize, *144 verify, consent, or otherwise approve the pleading or its allegations. Miles submitted to the trial court an amended complaint that was filed in the federal court suit in which Commonwealth Insurance Company and St. Paul Surplus Lines Insurance Company were substituted as the proper party plaintiffs. Miles also submitted the affidavit of Charles W. Kelly, former counsel for Commonwealth and St. Paul Surplus Lines, who stated that the original complaint was filed without consulting Cutter or Miles and that Cutter's counsel disputed factual allegations therein.
The trial court held the original complaint was inadmissible. This Court and the Supreme Court denied certiorari.
The Crosses argue the original complaint constitutes a prior inconsistent statement by a party defendant because Jack Ryan, the CEO of Cutter, testified that the infected donor exhibited no symptoms of AIDS when he donated plasma and that Ryan did not know whether that donor was HIV positive when he made his last blood donation in September 1983.
La.C.E. art. 801(D) excludes a statement from hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) Inconsistent with his testimony, and was given under oath subject to the penalty of perjury at the accused's preliminary examination or the accused's prior trial and the witness was subject to cross examination by the accused; ...
An allegation in a complaint is not "a statement given under oath subject to the penalty of perjury." Art. 801(D)(1) does not apply.
The Crosses argue that the complaint constitutes a judicial confession. Their brief quotes the complaint but does not specify which adverse facts are allegedly admitted. The argument appears to be that Miles judicially admitted that a known homosexual donated plasma at Austin Blood Components between November 18, 1982 and September 16, 1983, that Miles purchased plasma from Austin Blood Components and confirmed the donor was infected with AIDS when he died October 21, 1983.
La.C.C. art. 1853 defines a judicial confession:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it....
A judicial admission or confession is the express acknowledgement of an adverse fact. Howard Trucking Company, Inc. v. Stassi, 485 So.2d 915, 918 (La.1986), cert. den. 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986); Duhon v. Petroleum Helicopters, Inc., 554 So.2d 1270, 1280 (La. App. 3d Cir.1989), writ den. 559 So.2d 1360 (La.1990), overruled on other grounds, Green v. Industrial Helicopters, Inc., 593 So.2d 634, 644 (La.1992). An allegation, admission or confession in a pleading in another suit is an extrajudicial admission and is admissible as evidence, but is not a conclusive presumption and does not operate as estoppel unless the party invoking it has been prejudiced by relying upon it. Lakeshore Property Owners Association, Inc. v. Delatte, 524 So.2d 126, 130 (La.App. 4th Cir.1988).
Miles disputes that the original complaint was filed with its approval, consent or ratification. The amended complaint substituting the insurers for Miles' predecessor companies and the Kelly affidavit stating that Cutter disputed allegations in the original complaint which was filed without consultation supports the trial court's conclusion that the complaint is not a judicial admission.
Moreover, any error in disallowing the complaint as evidence was harmless. A November 4, 1983 memo by Jean Huxsoll of Cutter was admitted into evidence and states that fifteen lots of Factor VIII were voluntarily recalled because they contained plasma "from a donor who was diagnosed as having AIDS after his last donation." An attachment shows forty-eight donations from that donor between November 18, 1982 and September 16, 1983. Thus, the jury was aware that the donor who was diagnosed with AIDS had donated blood forty-eight *145 times and Cutter withdrew the lots of Factor VIII affected by that donor.
The jury determined that Brad infused Cutter Factor VIII which was contaminated with HIV and obviously accepted that the Austin donor was infected, that Cutter withdrew from the market the potentially affected Factor VIII, and that Brad infused several vials of that product. The allegations in the complaint are cumulative to evidence already in the record. The jury considered that evidence and found that Brad was infected before December 1982 and infusion of the Cutter product in 1983 did not affect his disease.
The Crosses argue in their reply brief that allegations in the complaint are relevant to strict liability. They contend the complaint admits that Cutter used plasma from the infected donor to manufacture Factor VIII between November 1982 and October 1983, and thus the complaint was admissible to show Cutter's strict liability for that contaminated product. That claim has no merit.
There is no evidence that prior to October 1983 Brad infused Factor VIII concentrate which was traced to the infected donor at the Austin facility. The November 4, 1983 memo of Jean Huxsoll provides details concerning Cutter's "voluntary recall." The attachment lists the lot numbers of all Factor VIII manufactured with that donor's plasma from November 18, 1982 through September 16, 1983, and the only numbers which correspond with Brad's infusion records are the lot numbers which Brad infused in October 1983. Additionally, the majority of factor concentrate which Brad infused in 1982 was manufactured by Alpha.
The jury considered the conflicting expert testimony on the theory of reinfection, or aggravation of a pre-existing condition by infusion of contaminated Factor VIII after the patient's initial infection by another source. The jury found that Cutter's withdrawn product was contaminated but there was no causation, effectively rejecting the reinfection theory. Absent evidence that Brad infused potentially contaminated Cutter Factor VIII prior to 1983, there is no causation. The federal complaint is irrelevant to strict liability and was properly excluded.

Expert Testimony
Dr. Thomas Drees was President of Alpha Therapeutic Corporation from 1978-1984 and the court qualified Dr. Drees as an expert in the business of blood banks. The trial court disallowed Dr. Drees' testimony that plasma collected from the Louisiana State Penitentiary was used by Cutter to manufacture Factor VIII and probably infused by Brad Cross. The Crosses argue Dr. Drees' testimony was relevant to show Cutter's negligence in obtaining plasma from high risk donors. Miles responds that the testimony was properly excluded because it is irrelevant and the underlying scientific methodology and facts were not established.
This Court denied certiorari on the Crosses' application for review, but we are not precluded from consideration of that issue on appeal. Young v. Logue, 94-0585 (La.App. 4th Cir. 5/16/95), 660 So.2d 32, 50, writs den. 95-2575, 95-2585, 95-2597 (La. 12/15/95), 664 So.2d 443-444.
La.C.E. art. 702 governs admissibility of expert testimony:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Whether expert testimony is admissible under Art. 702 turns on whether it would assist the trier of fact to understand the evidence or to determine a fact in issue. La.C.E. art. 702, comment (c). The decision to admit or exclude expert testimony is within the sound discretion of the trial court. La.C.E. art. 702, comment (d); Armstrong v. Lorino, 580 So.2d 528, 531 (La.App. 4th Cir.), writ den. 584 So.2d 1166 (La.1991).
Article 702 is identical to Federal Rule of Evidence 702, and Louisiana jurisprudence generally follows federal interpretation of Rule 702. Clement v. Griffin, 91-1664 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 426, writs den. 94-0717, 94-0777, 94-0789, *146 94-0791, 94-0799, 94-0800 (La. 5/20/94), 637 So.2d 478-79.
The trial judge must ensure that scientific expert testimony pertaining to new scientific knowledge is relevant and reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Daubert enumerated illustrative considerations to determine whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, and that analysis was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, 1123 (La.1993).
If expert testimony in response to hypothetical questions is predicated on a statement of unproven facts, it has no probative value and should not affect the outcome of the case. Meany v. Meany, 94-0251 (La. 7/5/94), 639 So.2d 229, 236. It is the trial judge's province to reject a hypothetical question predicated on facts which are not in the record. Id.; Guerra v. W.J. Young Construction Co., 165 So.2d 882, 886 (La.App. 4th Cir.1964), writ refused 246 La. 864, 167 So.2d 676 (1964).
In proffered testimony Dr. Drees testified:
Q.... At Louisiana State Penitentiary in Angola, Louisiana, if collected there, where would it [plasma] have been processed, according to your knowledge of how the manufacturing fractionator process works?
A. Probably in North Carolina, Cutter's plant.
* * * * * *
Q. Would plasma collected at the Louisiana State Penitentiary that was processed at the Cutter processing facility in ... Clayton North Carolina, in your opinion, more likely than not have wound up in the veins of Brad Cross?

A. Yes. [Emphasis added.]
Dr. Drees admitted on cross examination that he did not know when Cutter discontinued using prison plasma and could not specify which blood products Cutter made from prison plasma. There is no evidence when Cutter purchased blood plasma from Louisiana State Penitentiary, the distribution process from Cutter's Clayton, North Carolina processing facility, and whether Brad infused Factor VIII processed at that facility. Dr. Drees' opinion is based on hypothetical facts. The trial judge properly rejected that testimony.
Daubert is not determinative because Dr. Drees' opinion as to distribution and infusion of Factor VIII from Cutter's North Carolina facility does not constitute scientific expert testimony pertaining to new scientific knowledge.
Even if the trial court erred by not allowing that testimony, the error was harmless because the record contains testimony that Cutter processed Factor VIII with plasma obtained from prisons. Jack Ryan, President of Cutter Biological in 1982 and 1983, testified that from 1979 to 1981 Cutter used prison plasma to manufacture Factor VIII. He stated that Cutter discontinued using prison plasma for coagulation products such as Factor VIII in December 1982. Thus, the jury was aware of Cutter's use of prison plasma. This assignment has no merit.

Jury Instructions
The Crosses complain that the trial court refused to instruct the jury on the law of agency and fraud. They argue that Dr. Andes was Cutter's agent and fraudulently misrepresented information concerning HIV. Miles responds that the Crosses did not object at trial and waived any objection. Miles and Dr. Andes assert that the trial court instructed the jury on fraud and that there is no evidence to support a jury instruction on agency.
La.C.C.P. art. 1793(C) provides:
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection....
The jury instructions were not transcribed and are not in the record. After the jury *147 retired to deliberate all counsel objected on the record to various jury interrogatories and jury charges. Counsel for plaintiffs objected to the omission of a jury interrogatory on agency and omission of an instruction concerning Dr. Andes' alleged aggravation of a preexisting condition:
I think just one [objection to jury instructions], Your Honor, on behalf of the plaintiffs in that the theory aggravation of injury or aggravation of a preexisting condition seemed to be applied as read to the jury only to the defendants, Cutter (Miles) and not to the conduct of Dr. Andes.
Counsel did not object to omission of an instruction on fraud, and the transcript states that the trial court gave two of three requested instructions on fraud:
[COUNSEL FOR MILES]:
Your Honor, Cutter would respectfully object to any instruction given the jury on the subject of fraud for the reasons that fraud was not pleaded.... There was no evidence of fraud in this case and fraud is not relevant to any of the plaintiff's claims....
THE COURT:
In the totality of the jury charge I gave two of the plaintiff's requested charges on fraud. They're so innocuous as to be just a statement of the law.
The objection to the alleged omission of an instruction on fraud was not preserved for review. Berrera v. Hyundai Motor America Corp., 620 So.2d 890, 893 (La. App. 4th Cir.1993). The transcript does not substantiate plaintiffs' assertion that the jury was not instructed on fraud.
The Crosses did not specifically object to the omission of an instruction on agency. That argument has no merit.
A jury charge, even if it correctly states the law, must be based on evidence adduced during trial. Knight v. First Guaranty Bank, 577 So.2d 263, 272 (La.App. 1st Cir.), writs den. 581 So.2d 688, 690 (La.1991).
The Crosses argue that the trial court should have instructed the jury on agency because Cutter and Armour provided funds to the Comprehensive Hemophilia Care Center, and Cutter had previously retained Dr. Andes as an expert witness and consultant which created an agency relationship.
An agent is one who acts for or in place of another by authority from the latter. Oliver v. Central Bank, 26,932 (La. App. 2 Cir. 5/10/95), 658 So.2d 1316, 1321, writ den. 95-1469 (La. 9/22/95), 660 So.2d 477. An agency relationship is created by express appointment under La.C.C. art. 2985 or by implied appointment arising from apparent authority in order to protect innocent third parties. Id.; Anderson Window & Patio Co. v. Dumas, 560 So.2d 971, 975 (La. App. 4th Cir.1990).
The essential test for implied agency is whether the principal has the right to control the conduct of the agent and whether the agent has the right and authority to represent or bind the principal. Anderson Window & Patio Co. v. Dumas, 560 So.2d at 975. Apparent agency arises when the principal acts in such a manner as to give an innocent third party the reasonable belief that the agent has the authority to act for the principal. Id. Implied agency is established by the words and conduct of the parties and the circumstances of the case. An agency relationship may be created even if there is no intention to do so. Id.
Dr. Andes testified that he was a paid member of Tulane's full-time faculty. Dr. Andes did not represent he was an agent, representative, or employee of Cutter or Armour. He said Cutter compensated him on an hourly basis to review and render his opinion on medical records in unrelated cases. Cutter also provided funding to the Comprehensive Hemophilia Care Center to study a new product for previously untreated hemophiliac patients. Cutter reimbursed the Center about $1000 per patient for six to twelve months of treatment. Dr. Andes stated that Armour compensated him to review medical records in an unrelated case and rarely provided money to the Center. In 1987 Armour financed Dr. Andes' presentation in Tampa.
There is no testimony or evidence that Dr. Andes acted for or on behalf of the companies, that Miles or Armour had a right to *148 control Dr. Andes' conduct, or that Dr. Andes had the right and authority to represent Miles or Armour. There is no evidence of an express agency relationship between Dr. Andes and Miles or Armour.
The record does not support a jury instruction on agency.

Directed VerdictArmour
Mr. and Mrs. Cross argue that the trial court erred by granting a directed verdict in favor of Armour. They contend the evidence shows Brad's condition was aggravated by infusion of Armour's product which Armour withdrew from the market and the claim against Armour should have been submitted to the jury. In their original brief the Crosses argue there was testimony supporting the theory of reinfection or aggravation of a pre-existing condition by infusion of Factor VII which was infected with viruses. In their reply brief the Crosses submit there is substantial evidence that Armour Factor VIII which Brad infused was contaminated with HIV.
A party may move for a directed verdict at the close of the evidence offered by an opponent. La.C.C.P. art. 1810. A directed verdict is proper when, considering all evidence in the light most favorable to the party opposed to the motion, it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. Armstrong v. Lorino, 580 So.2d at 533; King of Hearts, Inc. v. Wal-Mart Stores, Inc., 27, 137 (La.App. 2 Cir. 8/23/95), 660 So.2d 524, 527. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Id.
A trial judge has much discretion in determining whether to grant a directed verdict. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 478, writ den. 94-0906 (La. 6/17/94), 638 So.2d 1094. The standard of review on appeal is whether reasonable persons could not reach a contrary verdict under the evidence. Id. The propriety of a direct verdict must be evaluated in light of the substantive law underpinning the claim. Id.
The trial court's reasons for granting the directed verdict (in a per curiam) state there is no evidence that the recalled Armour Factor VIII or any Armour Factor VIII was contaminated with HIV.
The Crosses introduced a June 30, 1986 NHF Alert (Medical Bulletin # 40, Chapter Advisory # 45) entitled "Factor VIII Product Return Recommended." That document recommends that patients return Armour Factor VIII that was processed with plasma collected prior to the HIV antibody test:
Armour Pharmaceutical Company has recommended that their lots of heat-treated Factor VIII concentrate (H.T. Factorate) manufactured from plasma collected prior to donor screening for HTLV-III antibody be returned. Attached is a list of the lot numbers involved in this voluntary action.
This precautionary action is occurring because of as yet incomplete information suggesting that three patients who received lots of H.T. Factorate prepared from plasma unscreened for HTLV-III antibody have changed from a negative test to a positive test for HTLV-III antibody.
The document states that "seroconversion in other recipients of the lots in question has not been found." Attached is a list of over 500 lot numbers withdrawn from the market.
Dr. Robert Remis, expert in epidemiology and public health, testified that Brad infused Factor VIII from three Armour lots in 1985 and 1986. Our examination of Brad's infusion records shows that between September 18, 1985 and March 22, 1986 Brad infused Armour Factor VIII from four lots, two of which are listed in the return notice. The record shows sixteen infusions from the two lots. The notice does not specify the lot numbers which were infused by the three patients who seroconverted and the record does not show whether Brad infused Factor VIII from those lots.
Dr. Remis testified that he presumed the Armour Factor VIII that Brad infused was *149 not screened for the HIV antibody. He had no data showing that product was infected.
Dr. Andrew Pavia, expert in internal medicine and infectious disease, testified that infusion of HIV-infected Factor VIII after initial infection by another source accelerates the patient's progression to AIDS. Dr. Pavia's opinion assumed that the pre-screened Armour product was contaminated with HIV and he admitted that he did not investigate or have an opinion as to whether the Armour Factor VIII was contaminated with HIV.
Dr. Pavia testified that Factor VIII might contain blood borne viruses other than HIV which are detrimental to an HIV patient. However, he testified that a comparison of viral strains in Brad's system was not performed before and after his infusion of Armour Factor VIII, which Dr. Pavia said would have provided unequivocal proof of reinfection.
Dr. Pavia testified that young hemophiliacs generally have a slower progression to AIDS but there is no objective evidence of Brad's progression. He stated that twenty-five to thirty percent of young hemophiliacs develop AIDS within nine years after initial infection. Considering the jury's conclusion that Brad seroconverted before December 1982, his progression to AIDS by 1989 was within those statistics.
Although a jury reasonably could conclude that infusion of contaminated Factor VIII by a patient previously exposed to HIV might accelerate that patient's progression to AIDS, the record does not contain evidence of such quality and weight that a jury reasonably could conclude that Brad's infusion of Armour Factor VIII in 1985 and 1986 affected his illness. Brad's records show that he infused Factor VIII from only two of over 500 lots listed in the June 30, 1986 NHF Alert. That document does not show whether any patient infused those lots and seroconverted.
The trial judge did not abuse his discretion by granting a directed verdict in favor of Armour.
Mr. and Mrs. Cross argue that the directed verdict in favor of Armour tainted the jury's determination of their claims against Cutter. The record does not support that assertion.
The trial court granted the directed verdict and dismissed Armour outside the jury's presence. The judge's explanation to the jury was brief and without detail:
Ladies and gentlemen, you will note the absence of counsel for Armour Pharmaceutical Company. Armour Pharmaceutical Company is no longer a party to this suit. You should not speculate as to the reason why they are or why they are not. That is the statement.
The jury was unaware of the reason for Armour's dismissal and the trial court admonished the jury not to speculate. The directed verdict did not affect the jury's decision as to Cutter.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] The record does not verify the complete name of the Baxter company.
[2] The appellate record begins with pleadings filed July 14, 1993 and does not contain plaintiffs' original and First Supplemental and Amending Petitions. Copies of the original petition and plaintiffs' Second Supplemental and Amending Petition are in the record.