820 So.2d 620 (2002)
Vanessa ROBERSON
v.
Harold AUGUST and the State of Louisiana Department of Corrections.
No. 2001-CA-1055.
Court of Appeal of Louisiana, Fourth Circuit.
May 29, 2002.
*622 Robert J. Caluda, Stephen C. Juan, New Orleans, LA, for Plaintiff/Appellant.
Richard P. Ieyoub, Attorney General, Suzan N. Richardson, Assistant Attorney General, Barbara L. Bossetta, Assistant Attorney General, Louisiana Dept. of Justice, Litigation Division, New Orleans, LA, for Defendant/Appellee.
*623 (Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge CHARLES R. JONES, and Judge PATRICIA RIVET MURRAY).
WILLIAM H. BYRNES, III, Chief Judge.
Plaintiff, Vanessa Roberson, appeals the January 25, 2001 judgment that granted the motion for directed verdict of defendants, Harold August and the State of Louisiana, through the Department of Corrections ("State"), and dismissed the plaintiffs claims. We affirm.
In 1997, Vanessa Roberson's son, Sim Wilson, was sentenced to a juvenile prison for possession of drugs. His juvenile probation officer was defendant, Harold August. Ms. Roberson alleged that Harold August made sexual overtures to her. When she rejected his advances, he told her about the rapes, beatings, and abuses occurring at Tallulah Juvenile Prison. August threatened to have Ms. Roberson's son transferred to that prison and to have his prison term extended unless she agreed to have sex with him. She complied but later reported August to his superiors, and he was disciplined but not terminated.
Vanessa Roberson's July 6, 1998 petition contained allegations of sexual harassment and infliction of intentional emotional distress against Harold August. She also claims that the State is vicariously liable for Mr. August's actions. Ms. Roberson asserts that she suffered extreme mental and physical harm and remains under psychiatric care.
After a jury trial commenced on January 22, 2001, at the conclusion of the case, the trial court granted a directed verdict on January 24, 2001 to the defendants, and dismissed Ms. Roberson's claims. Ms. Roberson's appeal followed.
On appeal Ms. Roberson contends that the trial court erred in: (1) finding that the evidence did not support the plaintiffs claims presented to the jury sufficient to reach a judgment in her favor; and (2) granting a directed verdict in favor of the defendants in light of the evidence presented.

Sexual Harassment
A directed verdict must be evaluated in the light of the substantive law underpinning the plaintiffs claim. Burris v. Wal-Mart Stores, Inc., 94-0921 (La.App. 1 Cir. 3/3/95), 652 So.2d 558, writ denied 95-0858 (La.5/12/95), 654 So.2d 352. The defendants assert that to prevail in a sexual harassment action, based on a quid quo pro theory or on the theory of a hostile working environment, both types of sexual harassment require proof of an employee/employer relationship. Merit or Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).
In the present case, Ms. Roberson was not an employee, and Harold August was not an employer or co-employee, and they did not have an employment relationship. Ms. Roberson did not have a civil cause of action against Harold August for sexual harassment on the theory of a hostile working environment. Ms. Roberson did not have a cause of action under Louisiana's anti-discrimination statute, La. R.S. 23:301 et seq., or under the federal statute, the Civil Rights Act of 1964, Title VII, Sec. 701 et seq., as amended, 42 U.S.C.2000e et seq. However, the plaintiff had a cause of action under Louisiana general tort law. See Attardo v. Brocato 96-1170 (La.App. 4 Cir. 2/5/97), 688 So.2d 1296; Rambo v. Willis-Knighton Medical Center, 34,864 (La.App. 2 Cir. 6/20/01), 793 So.2d 254, writ denied, 2001-2591 (La.12/14/01), 804 So.2d 632.
At issue is whether the directed verdict was proper after the trial on the merits.
*624 A motion for directed verdict under La. C.C.P. art. 1810 is properly granted if in viewing the facts in the light most favorable to the adverse party, the trial court concludes that the evidence is such that reasonable, fair-minded jurors cannot arrive at a verdict in favor of the nonmoving party. Lozano v. Touro Infirmary, 99-2587 (La.App. 4 Cir. 12/13/00), 778 So.2d 604, 607, writ denied, XXXX-XXXX (La.5/11/01), 792 So.2d 733. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Lott v. Lebon, 96-1328 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 616, writ denied, 97-0859 (La.3/21/9), 691 So.2d 92, and writ denied 97-0414 (La.3/21/97),691 So.2d 95; Walker v. Louisiana Health Management Co., 94-1396, p. 8 (La.App. 1 Cir. 12/15/95), 666 So.2d 415, 421, writ denied, 96-0571 (La.4/19/96), 671 So.2d 922. Evaluations of credibility should not be considered unless the opposing party failed to produce sufficient evidence upon which reasonable and fairminded persons could disagree. Id.
A directed verdict is appropriate only when the evidence overwhelmingly points to one conclusion. Hebert v. BellSouth Telecommunications, Inc., 01-00223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614. A motion for a directed verdict is a procedural device available in jury trials with an eye toward judicial economy. Reed v. Columbia/HCA Information Systems, Inc., XXXX-XXXX (La.App. 5 Cir. 4/11/01), 786 So.2d 142, writ denied XXXX-XXXX (La.6/22/01), 794 So.2d 796. While credibility evaluations should not enter the process, the trial court has much discretion in deciding whether to grant or deny the motion for directed verdict. Brockman v. Salt Lake Farm Partnership, 33,938 (La. App. 2 Cir. 10/4/00), 768 So.2d 836, writ denied XXXX-XXXX (La.12/15/00), 777 So.2d 1234; Delany v. Whitney Nat. Bank, 96-2144 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, writ denied 98-0123 (La.3/20/98), 715 So.2d 1211. A motion for directed verdict may be granted when, after considering all evidentiary inferences in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Burris v. Wal-Mart Stores, Inc., supra.
If there is "substantial evidence," or evidence of such quality and weight that reasonable and fair-minded jurors in exercise of their impartial judgment might reach different conclusions, the motion for directed verdict should be denied and the case should be submitted to the jury. Cross v. Cutter Biological, Div. of Miles, Inc., 94-1477 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, writ denied 96-2220 (La.1/10/97), 685 So.2d 142. The standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Lott v. Lebon, supra. The record supports the conclusion of the trial judge compelling the granting of a motion for a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law). Id., supra, p. 4, 687 So.2d at 616. A directed verdict should be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury. Wichser v. Trosclair, 99-1929 (La.App. 4 Cir. 2/28/01), 789 So.2d 24.

*625 Evidence

In the present case, the plaintiff, Ms. Roberson, maintains that she presented sufficient competent evidence to the jury. The defendant, Harold August, alleged that any sexual acts were consensual. Ms. Roberson argues that a credibility issue existed as to whether the jury could believe her and her family or the defendant, Harold August. Ms. Roberson asserts that a credibility evaluation is the exclusive province of the trier of fact and has no place in the decision on a motion for directed verdict.

Coerced or Consensual
Ms. Roberson testified that she agreed to have a sexual relationship with Mr. August who threatened that her son would be sent to the Tallulah juvenile prison and would not get out soon if she did not comply. Mr. August and his supervisor Edward Parrino testified that probation officers are assigned to juveniles on a random basis. Probation officers do not have the authority to select the juveniles they are assigned, or to determine to what facilities the juveniles are sent. The juvenile court has the authority to sentence juveniles and the Department of Corrections has the authority to assign juveniles to prison facilities. Probation officers can give a recommendation of early release to a facility, but the Staffing Committee has to agree or disagree with the recommendation. The probation officer is a member of the Staffing Committee. The probation officer cannot recommend a transfer from one secured facility to another secured facility.
Ms. Roberson said she thought that Mr. August had the authority to determine where her son would be sent. Ms. Roberson agreed that her close friend, Ronald Craft, as well as her brother-in-law were probation officers. The defendants imply that Mr. Craft or her brother-in-law could have clarified any questions she had about a probation officer's authority. Ms. Roberson agreed that she never sought advice from Mr. Craft.
At the time of her deposition in April 1999, Ms. Roberson testified that she had tapes of some of her conversations with Mr. August, but at trial she didn't know what happened to them. She said that in March 1997, a tape from her answering machine had Mr. August's message saying, "Pick up the telephone. Are you there, baby? I love you." This conversation does not indicate whether any sexual relationship was coerced.
Although Ms. Roberson said she only went to the Showcase Lounge once, three witnesses, Wayne Benjamin, Keetrone Singleton, and Will Humphrey, testified that they saw Ms. Roberson with Mr. August at the Showcase Lounge several times on Monday nights when they played cards with Mr. August. They testified that Ms. Roberson appeared comfortable and laughing.
Ms. Roberson and Ronald Craft both testified that Ms. Roberson did not tell Mr. Craft that Mr. August was forcing her to have sexual relations with him. When Ms. Roberson wrote her letter of complaint to Supervisor Edward Parrino, she did not state that Mr. August was forcing her to have sexual relations with him. Ms. Roberson's letter stated that Mr. August continually called her house, asking for dates and hanging up on her husband. The letter says that she had her phone number changed. At trial, Ms. Roberson testified that she asked Mr. August how he got her new number, and he told her that he was an investigator and could get whatever he wanted.
Mr. August had three or four photographs of Ms. Roberson. On the back of one, Ms. Roberson had signed, "Keep this *626 picture safe and near your heart. Vanessa." Ms. Roberson explained that she gave these pictures to her son who was in prison at Tulane and Broad. Ms. Roberson said that Mr. August took the pictures from her son. She testified that her son sometimes called her "Momma" and sometimes "Vanessa." S.W. stated that his mother mailed him the photographs. S.W. said that sometimes he calls his mother "Vanessa." S.W. testified that sometimes his sister B.W. called her mother "Vanessa" "ever now and again." Harold August took the pictures away from S.W.
When questioned, B.W. (S.W.'s sister) answered that she called her mother, "Mother." When asked why B.W. didn't call her "Vanessa," she replied: "Because she's my mom." The daughter B.W. stated that her mother told her about the sexual relationship with Mr. August in the middle of 1997. B.W. never overheard any conversation between her mother and Mr. August. Ms. Roberson testified that she also told her sister Audry Lyons about the coerced sexual affair in her telephone conversation from the Robersons' home and from the hotel in Baton Rouge. Ms. Lyons lived in San Antonio, Texas, and she did not testify at trial.
Ms. Roberson testified that her ex-husband and his mother had custody of S.W. In her deposition, Ms. Roberson said that her son S.W. lived with her from 1989 to 1991 but in her deposition, Ms. Roberson stated that her son lived with her from 1981 to 1987. To account for inconsistencies in her trial and deposition testimony concerning these times and other differences, Ms. Roberson related that she sent a correction sheet to the court reporter who took her deposition; however, the corrections were never made, are not in the record, and the plaintiff did not inform the defense that there were corrections in Ms. Roberson's deposition testimony.
To support his claim that his sexual relationship with Ms. Roberson was consensual, Mr. August testified that he rented cars for Vanessa and her daughter, B.W. Ms. Roberson testified that Mr. August only rented a car for her one time. She denied that Mr. August rented a car and a Hammond hotel room for her daughter. Mr. Roberson knew that his wife had rental cars from time to time, but he thought she had obtained the rental cars through B.W.'s boyfriend who worked for a rental car agency.
Ms. Roberson and Mr. August had a rift over a car rental. Ms. Roberson testified that Mr. August wanted her to rent a car to go to meet him. Mr. August stated that he rented the car for Ms. Roberson because she told him that her niece had an emergency. At that time, Mr. August said that he and Ms. Roberson no longer had a sexual relationship in 1998. Ms. Roberson agreed that the rental car was not a gift but she kept it for a few days. In her deposition, Ms. Roberson stated that there was never an agreement that she would pay for the rental car. Ms. Roberson did not tell her husband that Mr. August rented the car for her.
Ms. Roberson stated that when she told Mr. August that their relationship was over, he threatened to tell her husband about the rental car. Mr. August contacted Mr. Roberson for payment of the rental car bill. Mr. Roberson testified that he agreed to pay for the bill but told Mr. August that he was out of work. Ms. Roberson stated that after Mr. August approached her husband about paying for the rental car, Mr. August brought the pictures of the rental car in front of Mr. Craft's residence to Mr. Roberson. Then Ms. Roberson reported Mr. August to Mr. Parrino, and Mr. Parrino listened to the conversation at the Robersons' house on May 29, 1998.
*627 Mr. August also testified that he helped Ms. Roberson with the Robersons' income tax reports. He provided copies of the Robersons' income tax report records, including check stubs, W-2 forms, and an original letter from the State Department of Taxation and Revenue that was addressed to Mr. Roberson. Ms. Roberson denied that Mr. August went with her to several places to obtain tax forms for state taxes due for past years. The Robersons stated that Mr. Roberson never filed income taxes. Ms. Roberson said she did not give the tax information to Mr. August. Mr. Roberson did not know how Mr. August had the Robersons' income tax records. Ms. Roberson never saw the 1993 tax form before, but she acknowledged her signature was on the back of the form. She and her husband stated that it was not Mr. Roberson's signature on the form. Mr. August testified that Ms. Roberson signed Mr. Roberson's name.
Mr. August further stated that he helped the Robersons move furniture when they moved to a new residence. The Robersons agreed that Mr. August helped Mr. Roberson move a triple dresser.
At trial, Ms. Roberson testified that Mr. August continued to call her house, harassing her. However, in the letter to Mr. August's supervisor, Ms. Roberson stated that May 29, 1998 was the first time she threatened to report Mr. August. The letter also contained Ms. Roberson's accusation that Mr. August illegally got her information about her parole status.
Mr. August testified that where he checked with the clerk, there was no outstanding warrant for Ms. Roberson. Mr. August spoke to her probation officer who gave him a copy of the letter of discharge from Ms. Roberson's file showing that she was no longer on probation. Mr. August misrepresented to the probation officer that Mr. August was conducting an investigation of Ms. Roberson and a home study of Ms. Roberson's residence. Mr. August admitted that this was not true.
Mr. August's supervisor, Mr. Parrino, testified that Ms. Roberson did not tell him about a sexual relationship with Mr. August. When Mr. Parrino investigated Ms. Roberson's accusations, Mr. August told him of the sexual affair. Mr. August was suspended on one count for violation of Rule 14F for unprofessional or inappropriate behavior with a client or the client's family. Mr. August was also suspended for a second count of obtaining a termination letter from Ms. Roberson's probation officer. Mr. August was suspended without pay for 30 days on one count and 60 days on the other. When Mr. Parrino received a letter from Detective Meunier of Jefferson Parish Sheriffs Office, saying that Mr. August was being investigated on an extortion charge by Ms. Roberson, Mr. August was not allowed to return to work pending the investigation. Detective Meunier sent a letter saying the charges had been refused, and Mr. August returned to work. Ms. Roberson did not report to Mr. Parrino that she and Mr. August were having a sexual relationship. Ms. Roberson agreed at trial that she did not tell the police that she and Mr. August had a sexual relationship.
Mr. Parrino stated that Ronald Craft had also been admonished regarding an inappropriate relationship with Ms. Roberson. Craft was disciplined for 90 days suspension without pay.
Mr. August testified that he was not aware of the inmate abuse by guards at Tullulah in 1997 when he met Ms. Roberson. He said that the inmate abuse become public knowledge around the end of 1998 or in 1999. Ronald Craft testified that he was familiar with the juvenile detention facility at Tallulah, Louisiana in *628 1997. Mr. Craft was aware of inmate beatings in 1997. One of his juveniles was severely beaten. The juvenile went to the hospital, and testicular cancer resulted. Two guards were fired and one resigned. In late 1997 or early 1998, a juvenile judge sent a memo to the agency advising staff members that they were no longer to recommend sending prisoners to Tallulah. The Tallulah facility was a private institution that was taken over by the State.
Mr. August stated that Ms. Roberson called him after they met at the courthouse. She came to his office to see him. She asked him for help with her tax forms. She initiated the sexual contact by putting her hands on him, kissing him on the cheek, and rubbing against him while they were gathering information for the tax bills. Mr. August testified that she suggested sexual relations first. Mr. August stated that Ms. Roberson said that she and her husband were separated.
According to Mr. August, the sexual relationship continued until February or March 1998. When Ms. Roberson called Mr. August's wife a couple of times, he got upset and did not want Ms. Roberson bothering him anymore. She telephoned at his office almost daily for almost a month. Mr. August stated that he wanted to be with his wife and he thought Ms. Roberson was interested in Ronald Craft. Mr. August claimed that Ms. Roberson went to Mr. Craft's house every Wednesday, but he agreed that Ms. Roberson never said she was having sexual relations with Mr. Craft. Mr. August took pictures of Ms. Roberson's car in front of Mr. Craft's house and showed the pictures to Mr. Roberson.
Ms. Roberson did not deny that she went to Baton Rouge and stayed at a hotel with Mr. August. Her husband testified that he thought she was going out of town to do community service. At trial, Ms. Roberson denied that she spent the night, but in her deposition, she said she spent the night in Baton Rouge and left at noon the next day. Ms. Roberson and Mr. August did not dispute that a video was made of their sexual encounter in Baton Rouge. Ms. Roberson's trial testimony and her deposition testimony differed in that she stated that she watched the video by herself in her deposition, which contradicted her trial testimony that she and Mr. August watched the tape together at the hotel.
Ms. Roberson did not provide evidence that anyone else had first-hand knowledge that the sexual affair was coerced. Ms. Roberson testified that B.W. and Ms. Roberson's sister knew of the coerced affair, but B.W. did not see or overhear a conversation between Mr. August and Ms. Roberson to establish that a forced relationship existed. Ms. Roberson's sister did not testify. The plaintiff did not provide sufficient supporting witnesses' testimony or evidence to substantiate her claim of sexual harassment by a preponderance of the evidence. Viewing the evidence submitted, the record supports the conclusion of the trial judge granting the motion for a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law). This court concludes that reasonable people could not reach a contrary verdict. Ms. Roberson did not prove a tortious action based on sexual harassment.

Intentional Infliction of Emotional Distress
Ms. Roberson also contends that she was harmed by the tort of Harold August's intentional infliction of emotional distress. Ms. Roberson asserts that even if the sexual relationship were consensual, after Ms. Roberson broke off the relationship, Mr. *629 August continued to call her, took photographs and brought them to her husband. This is the basis of her claim of intentional infliction of emotional distress.
To recover for a tort, a plaintiff must prove by a preponderance of the evidence that her damages resulted from the defendant's actions. Johnson v. English, 34,322 (La.App. 2 Cir. 12/20/00), 779 So.2d 876. To show intentional infliction of emotional distress, the plaintiff must prove: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White v. Monsanto Co., 585 So.2d 1205 (La.1991).
"Extreme and outrageous conduct" required to maintain a cause of action for the intentional infliction of emotional distress is conduct so atrocious as to pass the boundaries of decency and to be utterly intolerable to civilized society. Johnson v. English, supra. Conduct required to maintain a cause of action for intentional infliction of emotional distress must be intended to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry or the like. Id. Liability for emotional distress intentionally caused by extreme and outrageous conduct does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. King v. Phelps Dunbar, L.L.P., 98-1805 (La.6/4/99), 743 So.2d 181.
In Scamardo v. Dunaway, 94-545 (La. App. 5 Cir. 2/15/95); 650 So.2d 417, appeal after remand, 96-1036 (La.App. 5 Cir. 4/29/97); 694 So.2d 1041, writ denied, 97-1395 (La.9/5/97); 700 So.2d 517, the former husband filed suit against the doctor for negligent or intentional infliction of emotional distress. The former husband alleged that while the husband and wife were consulting with the doctor for infertility treatment, the doctor and wife engaged in an adulterous affair which ultimately made the plaintiff's marriage insupportable. The Fifth Circuit found that the plaintiff did not state a cause of action for intentional or negligent infliction of emotional distress but the husband was allowed to amend his complaint. After remand, the appellate court again held that the husband's allegations, which were based on the underlying fact of the adulterous relationship, did not give rise to an action for emotional distress. That court noted that: "... unless the actor has knowledge of the plaintiff's particular susceptibility to emotional distress, the actor's conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities." Id., 650 So.2d at 419. The susceptibility of a particular plaintiff should be taken into account whether the defendant intended or negligently inflicted severe emotional distress.
In Rambo v. Willis-Knighton Medical Center, supra, the former employee failed to establish sexual harassment by the employer under state tort law, where audio tapes produced by the employee offered no evidence of sexual harassment, executives for the employer testified that they did not receive a letter from the employee containing sexual harassment allegations, and the employee's testimony at trial was inconsistent with testimony at previous depositions.
In the present case, Ms. Roberson testified that about the time that her son was released from prison, she told Mr. August she didn't want to have a sexual relationship anymore. He was furious and threatened her. Ms. Roberson stated that *630 Mr. August went to her house four times and kept calling and harassing her. Ms. Roberson said that the harassment stopped in May 1998 after Ms. Roberson went to court to get an abuse prevention order. Ms. Roberson testified that she did not report to the police that Mr. August was forcing her to have a sexual relationship with Mr. August because Ms. Roberson did not want her husband to find out.
Ms. Roberson stated that she filed a complaint against Mr. August with Mr. Edward Parrino and the Department of Corrections. On May 29, 1998, Mr. August called and asked to meet her at lunch time. She agreed. Mr. Parrino went to her house, and they waited for Mr. August to call when she did not meet him. Mr. Parrino listened in on the phone conversation between Ms. Roberson and Mr. August. According to Ms. Roberson's June 1, 1998 statement, Mr. August was breathing hard and asked why she didn't come. Mr. August asked if Ms. Roberson told Mr. Parrino. Ms. Roberson replied that she told Mr. Parrino that she wanted Mr. August to stop calling her house. He said that he would never call again, but Ms. Roberson said she knew it was a lie. Mr. Parrino went back to the office and wrote Harold August up.
Ms. Roberson said she called Mr. August's wife and asked her to tell Mr. August to stop calling her. Ms. Roberson testified that she felt raped, she didn't want relations with her husband and she sought psychiatric help.
Dr. C.B. Scrignar first saw Ms. Roberson on July 14, 1999, more than a year after the sexual relationship occurred. Dr. Scrignar testified that he used the Symptom Inventory Checklist and the Zung Self-Rating Depressive Scale in evaluating Ms. Roberson's condition as depression. He found that she had a major depressive disorder. Dr. Scrignar attributed Ms. Roberson's disorder to the coercive sexual relationship she had with Mr. August. Dr. Scrignar opined that her depression resulted from the conflict between engaging in the sexual relationship to help her son and the ramifications on her marriage with her tremendous guilt on the issue of infidelity. Dr. Scrignar determined that Ms. Roberson needs psychiatric treatment weekly for a year. He also found that Ms. Roberson should have medications and cognitive behavior therapy.
Ms. Karen August testified that Ms. Roberson continuously called the August house and hung up on her and the children. Ms. August could tell from the Caller ID that it was the same caller. Once Ms. August used the number from the Caller ID, and called back. She told the person that her number had been on Caller ID for many many months. When Ms. August asked, "who is this?" Ms. Roberson said, "This is Vanessa." Later that night, Ms. Roberson called back and told Ms. August not to call her house. She then cursed Ms. August. Ms. August wrote down the date, September 5, 1997, because she thought the phone call was threatening.
Ms. August also testified about the following phone call: Once when Ms. Roberson called for her husband, Ms. August asked if she could leave a message. Ms. August said, "Would you give me the message? I can give the message. I don't understand why you would be calling my husband." Ms. Roberson said she didn't have anything to tell her. Ms. August said, "I'm his wife, you can tell me." Ms. Roberson replied, "Well, you're his wife and I'm his lover." She started laughing. Mr. August took the phone and said, "I told you to stop calling."
Both Ms. Roberson and Ms. August testified about the distressing phone calls. Dr. Scrignar did not evaluate Ms. Roberson's *631 symptoms until a year later, and Ms. Roberson did not provide evidence that Mr. August had knowledge that she was more sensitive or more susceptible to emotional distress. Ms. Roberson failed to offer persuasive evidence upon which reasonable and fair-minded persons could disagree that the plaintiff did not prove by a preponderance of the evidence that Ms. August's conduct was severe enough to give rise to an action based on emotional distress.

Vicarious Liability
Ms. Roberson's allegations against the State of Louisiana, Department of Public Safety and Corrections ("State"), were based on vicarious liability.
To determine whether an employer is vicariously liable for the intentional tort of an employee, the tortuous conduct must be primarily employment oriented, was reasonably incidental to the performance of the employee's duties, occurred on the employer's premises, and occurred during the hours of employment. Vicarious liability is attributed to the employer's business when the intentional tortious conduct is connected in time, place, and causation to the employment duties. Felix v. Briggs of Oakwood, Inc., 99-721 at 4 (La.App. 5 Cir. 12/15/99), 750 So.2d 1091, 1092-93. Conduct motivated by purely personal considerations extraneous to the employer's interests does not impose a risk of harm of vicarious liability to the employer. Doe v. Louisiana Mun. Ass'n, 99-539 at 7, (La.App. 5 Cir. 10/26/99), 746 So.2d 179,183. See also Baumeister v. Plunkett, 95-2270 (La.5/21/96), 673 So.2d 994.
In Patterson v. Al Copeland Enterprises, Inc., 95-2288 (La.App. 4 Cir. 1/19/96), 667 So.2d 1188, the employer/restaurant was not vicariously liable for the intentional tortious acts of its assistant manager supervisor in sexually assaulting 16-year-old employee on the employer's premises after working hours, as the supervisor was not acting in course and scope of his employment; sexual assault was not related to the supervisor's employment duties, did not further his employer's objectives, was not a risk of harm fairly attributable to his employer's business and was done for purely personal considerations entirely extraneous to the employer's interest.
In the present case, Mr. August's conduct was not connected in time, place, and causation to his employment duties. Mr. August's conduct was motivated by purely personal considerations. Further, because the plaintiff failed to show by a preponderance of the evidence that the State's employee, Harold August, was liable for sexual harassment or severe emotional distress, the State cannot be vicariously liable.
Upon review of the record, under the standard set forth by this Court in Lott, supra, that based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law), the plaintiff failed to bear her burden of proof. The trial court properly granted a directed verdict, dismissing Ms. Roberson's claims.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
MURRAY, J., CONCURS IN THE RESULT.