887 So.2d 722 (2004)
Pearl Ann DAVIS and Wayne Davis, individually, and on behalf of their Minor Child, Kristina Davis
v.
The BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, Dr. Joseph M. Miller, Jr., Dr. Yuan S. Kao, and John Van Brunt.
No. 2003-CA-2219.
Court of Appeal of Louisiana, Fourth Circuit.
November 17, 2004.
Rehearing Applications Denied December 15, 2004.
*723 Lawrence D. Wiedemann, Karen Wiedemann, Wiedemann & Wiedemann, New Orleans, LA, for Plaintiff/Appellee.
Charles C. Foti, Jr., Attorney General, Kathi V. Logan, Assistant Attorney General, LA Department of Justice, Litigation Division, New Orleans, LA, J. Marc Vezina, Special Assistant Attorney General, Andrea C. Caplan, Special Assistant Attorney General, Vezina and Gattuso, L.L.C., Gretna, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge DENNIS R. BAGNERIS, JR., Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, JR., Judge ROLAND L. BELSOME).
DAVID S. GORBATY, Judge.
Dr. Joseph M. Miller, Jr., and his employer, the Board of Supervisors of Louisiana State University, appeal a judgment rendered upon a jury verdict finding Dr. *724 Miller and his employer at fault for injuries sustained by Pearl Ann and Wayne Davis, for the wrongful birth of their daughter, Kristina.[1] For the following reasons, we reverse in part, affirm in part, and render.

PROCEDURAL HISTORY:
Pearl Ann and Wayne Davis filed suit against the Board of Supervisors of LSU and its employees, Dr. Miller, Dr. Yuan S. Kao and John Van Brunt[2], alleging failure to advise them timely of a chromosomal abnormality present in their unborn child, Kristina. Plaintiffs alleged that had they known of the abnormality sooner, they would have terminated the pregnancy. Plaintiffs originally sought damages on their own behalf for their extraordinary medical expenses, extraordinary costs of raising a child born with Kristina's disabilities, and their emotional and mental anguish arising from the child's birth. Plaintiffs also sought recovery on Kristina's behalf for her extraordinary medical expenses, physical and mental pain and suffering, and loss of enjoyment of life. The wrongful life claim was the subject of a previous appeal before this Court, Davis v. Bd. of Supervisors of Louisiana State University, 97-0382 (La.App. 4 Cir. 3/18/98), 709 So.2d 1030, writ denied 98-1329 (La.6/26/98), 719 So.2d 1288. The Court affirmed the judgment of the trial court granting the defendants' motion for summary judgment on the wrongful life claim because plaintiffs failed to prove that a genuine issue of material fact existed with regard to the issue of whether the alleged delay in notifying the parents of Kristina's possible birth defects and/or mental retardation caused the parents to choose to continue the pregnancy. Therefore, the alleged delay was not a cause in fact of Kristina's alleged wrongful life.
Prior to judgment on the wrongful life claim, Dr. Kao and Mr. Van Brunt filed a motion for partial summary judgment seeking dismissal of the parents' wrongful birth claim. They contended that there was no dispute that the parents were counseled about the possibility of birth defects and/or mental retardation of their unborn child, and that they were notified within the necessary time limits to obtain an abortion if they so desired. Dr. Miller and LSU also filed a motion for partial summary judgment on basically the same grounds.
On the same date that the trial court granted the defendants' motion for summary judgment on the wrongful life claim, it denied defendants' motions for summary judgment on the wrongful birth claim.
Following the opinion rendered by this Court in Davis, supra, defendants filed another motion for summary judgment arguing that plaintiffs would not be able to bear their burden of proof at trial. Defendants incorporated an exception of no cause of action as to Wayne Davis into the motion. They alleged that Wayne Davis had no cause of action because any duty owed by defendants was owed solely to Mrs. Davis as the patient. Further, if Mr. Davis suffered any damages, those damages were caused by his wife's refusal to have an abortion, an intervening cause. The trial court denied the motion.
Dr. Miller filed another motion for summary judgment seeking to have plaintiffs' case dismissed against him on the ground that plaintiffs would not be able to bear the burden of establishing the standard of *725 care charged to him, or that he had breached the standard. The trial court denied the motion.
The trial of this matter commenced on August 4, 2003. At the close of plaintiffs' case, defendants moved for a directed verdict on the same basis as the aforementioned motion for summary judgment. Defendants argued that plaintiffs had produced no evidence or testimony by a specialist practicing in Dr. Miller's field to establish the appropriate standard of care, or that Dr. Miller had breached the standard. The trial court denied the motion, stating that it believed Dr. Jacobs had testified concerning the standard of care and that he believed Dr. Miller had deviated from that standard.
Dr. Miller and LSU now appeal the trial court's denial of the motion for summary judgment raising the exception of no cause of action for Wayne Davis' wrongful birth claim, the denial of Dr. Miller's second motion for summary judgment, the denial of the motion for directed verdict at the close of plaintiffs' case, and the jury verdict, which they argue is contrary to the law and evidence.

FACTS:
Pearl Ann Davis became pregnant by Wayne Davis in approximately late February or early March of 1990. At her second visit with Dr. Jack Jacobs, an obstetrician/gynecologist (OB/GYN)[3] with whom she had treated for several years, Dr. Jacobs recommended that Mrs. Davis undergo an ultrasound and amniocentesis[4] because of her age. Dr. Jacobs referred Ms. Davis to Dr. Miller, a perinatologist.[5]
Mrs. Davis met with Dr. Miller on June 28, 1990, to discuss the procedures recommended by Dr. Jacobs. After explaining the known risks associated with the procedures, Mrs. Davis signed an informed consent form. An ultrasound was performed, and then Dr. Miller withdrew amniotic fluid from Mrs. Davis for analysis by LSU's Cytogenetics Laboratory. Mrs. Davis was aware that it would be at least 2 weeks before any results were obtainable.
The actual analytical procedure is known as a karyogram. The cells removed from the mother are placed in two flasks (flask A and B). A growing medium is added to each. When the cells are ready in their respective flask, they are transferred to slides and analyzed under a microscope. The cytotechnologist examines them to determine if the appropriate number and size of chromosomes are present.
In this case, the cells in flask B grew more quickly than those in flask A. Mr. Van Brunt examined the cells from flask B and issued a preliminary report dated July 11, 1990, indicating that the preliminary karyotype confirmed a normal female. The report also indicated that a karyogram would follow in 6 to 8 weeks.
The Cytogenetics Laboratory telephoned the results to Dr. Miller's office, which, in turn, notified Mr. and Mrs. Davis by telephone. Dr. Miller's office also prepared a report that reflected the results they had been given by the lab, and forwarded the report to Dr. Jacobs. Mrs. *726 Davis testified that she was not told that the results were preliminary.
After analyzing the cells in flask A, which were not ready for harvesting until July 23, it was noted that there was a potential problem with the fetus based on the existence of a mosaic marker.[6] Dr. Miller was notified of this situation on or about August 9, and his office relayed the information to Dr. Jacobs. Mr. and Mrs. Davis were notified that same day that they should contact Dr. Miller as soon as possible. It is unclear by whom they were contacted, although it appears that Dr. Jacobs' office left a message. Mr. and Mrs. Davis met with Dr. Miller that same day, and blood samples were obtained from both parents.
On August 14, 1990, Mr. and Mrs. Davis met again with Dr. Miller and Dr. David Hyman, a pediatric geneticist. Dr. Hyman advised plaintiffs that the normal risk of their child having a birth defect or mental retardation was three out of one hundred, or a 3 percent chance. Due to the presence of the micro marker, there was a greater risk, approximately 12 percent. However, this correlated with an 88 percent chance that the child would be normal. The parents were advised of their options to continue the pregnancy or to terminate it based on this increased risk. Dr. Miller informed the parents that he would be leaving on vacation shortly and that they might not be able to reach him if they called after August 16. The Davises called the next day, August 15, and informed Dr. Miller that they would not be terminating the pregnancy. Kristina was born December 6, 1990.[7]

DISCUSSION:
In their first and second assignments of error, defendants argue that the trial court erred in denying their motion for summary judgment, which raised the exception of no cause of action as to Wayne Davis, and in denying Dr. Miller's motion for summary judgment, which asserted that plaintiffs' would not be able to satisfy their burden of proof at trial because plaintiffs had not identified any expert to testify as to the appropriate standard of care or any breach thereof.
These two assignments of error have no merit. The trial court denied both motions, and defendants did not seek writs to this Court. Whether or not plaintiffs would be able to bear their burden at trial is now a moot issue; the trial is over. Thus, it is too late to raise these assignments of error.
In their third assignment of error, defendants claim the trial court erred in not granting their motion for directed verdict at the close of plaintiffs' case. Defendants argue that plaintiffs failed to establish the standard of care applicable to Dr. Miller, or that he breached said standard.
A party may move for directed verdict at the close of evidence offered by an opponent. La.Code Civ. Proc. art. *727 1810. A directed verdict is proper when, considering all of the evidence in the light most favorable to the non-mover, it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. Cross v. Cutter Biological, Div. of Miles, Inc., 94-1477 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, 148. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Id.
A trial judge has much discretion in determining whether to grant a directed verdict, and the standard of review on appeal is whether reasonable persons could not reach a contrary verdict under the evidence. Id. The question to be asked by the reviewing court is not whether plaintiff proved his case by a preponderance of the evidence, but rather, upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of plaintiffs. Hebert v. Bellsouth Telecommunications, Inc., 01-0223, p. 5 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, 617. Further, the appellate court must determine if the record supports the granting of a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law). Roberson v. August, 01-1055, pp. 4-5 (La.App. 4 Cir. 5/29/02), 820 So.2d 620, 624.
Generally, in a medical malpractice case, the plaintiff must prove that:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practice in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.Rev.Stat. 9:2794 A. Thus, a plaintiff must establish the standard of care applicable to the charged physician, a violation by that physician of the standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting there from. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228, 1230; Williams v. Memorial Medical Center, 03-1806, pp. 15,16 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1054; Abdullah v. Simmons, 98-0564, p. 4 (La.App. 4 Cir. 9/13/00), 772 So.2d 698, 701.
To determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of the medical profession and who are qualified to testify. Jackson v. State through Charity Hosp. of Louisiana at New Orleans, 94-2090 (La.App. 4 Cir. 5/16/95), 655 So.2d 795. The jurisprudence has recognized that "an expert witness is *728 generally necessary as a matter of law to prove a medical malpractice claim." Williams v. Metro Home Health Care Agency, Inc., 02-0534, p. 5 (La.App. 4 Cir. 5/8/02), 817 So.2d 1224, 1228. Where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care. La.Rev.Stat. 9:2794 A(1); McDaniel v. Reed, 00-2529, p. 3 (La.App. 4 Cir. 10/3/01), 798 So.2d 1121, 1123.
Defendants specifically argued that plaintiffs failed to meet their burden of proof as to Dr. Miller because none of plaintiffs' witnesses established the standard of care applicable to Dr. Miller or that he had breached that standard. In plaintiffs' case in chief, both Mr. and Mrs. Davis testified, as well as Dr. Jacobs, Pearl Ann's primary OB/GYN; Dr. Beverly Howze, a psychologist who counseled plaintiffs; and Dennis Harold, Pearl Ann's husband at the time of trial. Additionally, the deposition testimony of Drs. Shapira, Frist and Hyman was introduced into evidence. Defendants argued to the trial court that Dr. Shapira was accepted as an expert in clinical and biochemical genetics, Dr. Frist was accepted as an expert in forensic pathology and laboratory testing and reporting, and Dr. Hyman was accepted as an expert in pediatric and clinical genetics[8], and were therefore not qualified to testify as to the standard of care applicable to Dr. Miller, an OB/GYN, with a subspecialty in maternal/fetal medicine. Thus, Dr. Jacobs was the only plaintiffs' witness who was qualified to address the issue of standard of care and breach thereof. However, because Dr. Jacobs' testimony did not establish the standard of care applicable to OB/GYN's practicing in the subspecialty of maternal/fetal medicine, or that Dr. Miller had breached the standard of care, plaintiffs had failed to prove their case, and a directed verdict was appropriate.
Plaintiffs argued that Dr. Jacobs had established the appropriate standard and had testified that, in his opinion, Dr. Miller had breached the standard. The trial court agreed, and denied the motion for directed verdict.
Dr. Jack Jacobs testified that he was a board certified OB/GYN. He did not perform amniocenteses or ultrasounds on patients as part of his practice. When he determined that a patient was a candidate for amniocentesis, it was his usual practice to refer the patient to the LSU perinatology department. He did not refer the patient to any particular doctor; rather, the perinatology department would assign the patient to the next available doctor.
Early on in Pearl Ann's pregnancy, Dr. Jacobs discussed with Pearl Ann the fact that she would be 35 years of age at the time of delivery. He recommended she have an amniocentesis performed, and referred her to the LSU perinatology department. On July 10, 1990, he received a letter from Dr. Miller that summarized Pearl Ann's visit. The letter indicated that Mr. and Mrs. Davis presented on June 28 for genetic counseling because of her advanced maternal age. After they were told of the risks involved, Mrs. Davis elected to have the test. Dr. Miller withdrew the amniotic fluid and sent it to the laboratory for an alpha fetal protein test and karyotype. The letter stated that Dr. Jacobs' office would be notified when the results were available, usually in 2½ weeks.
*729 The next day, July 11, Dr. Jacobs received a report from the cytogenetics laboratory with Dr. Miller's name typed in as "consulting physician." The report indicated the test results were normal. The report was signed by Dr. Kao, as director of the laboratory, and Terry Van Brunt, as the technician. Dr. Jacobs admitted that the document reflected it was a preliminary report, but testified that because it said the results were normal, he did not expect to receive any further reports. Dr. Jacobs further admitted that he was aware that sometimes results would be delayed because cells took longer to grow, and, in fact, sometimes did not grow at all. However, the normal time frame for receiving results was approximately ten working days. Dr. Jacobs answered affirmatively when asked if he was relying on Dr. Miller to accurately report the results of the test.
On August 16, Dr. Jacobs received a report from Dr. Hyman, a geneticist on staff at LSU. The letter was a "follow-up" report outlining the August 14 meeting between Drs. Hyman and Miller and the Davises. It explained that a mosaic marker had been identified, and that the Davises had been counseled about the increased risk that their baby would be born with physical defects and/or mental retardation, and of their options with regard to continuing or terminating the pregnancy. Mrs. Davis met with Dr. Jacobs on August 15, and they discussed the new developments leading Dr. Jacobs to believe that Dr. Miller had informed him of the problem prior to August 15. Dr. Jacobs was asked if he was "shocked" to receive the subsequent report, to which he replied: "Well, I mean you're upset when you receive the report because, you know, you had been optimistic that everything had been completely normal in the pregnancy and then unfortunately you have to  It's a happy moment. You have to change gears to a very serious and realistic moment, and so, yes, you're upset to see this particular type of report." Dr. Jacobs recalled that up until the time she learned of the potential problem with her pregnancy, Mrs. Davis was a happy mother looking forward to the birth of her child. He was aware that after Mrs. Davis learned of the possibility that her child would not be normal, she attended therapy to help her cope with the news.
On cross-examination, Dr. Jacobs explained that amniocentesis cannot be performed until the 14th week of pregnancy. He interpreted a note on Mrs. Davis' chart to indicate that his office attempted to contact her on August 9 about the subsequent lab report, but his office did not have a valid phone number. Dr. Jacobs surmised that August 9 must have been the date he was notified by Dr. Miller's office. His notes for August 15 indicate that he discussed the results of the amniocentesis with Mrs. Davis, "Decision up to her. Knows the risk." He could not recall if Mrs. Davis expressed on that day a desire to seek a termination. Dr. Jacobs believed it was too much information to digest in a short period of time. His notes of August 30 indicate that by that time Mrs. Davis had decided not to terminate her pregnancy.
Dr. Jacobs was asked if Mrs. Davis ever expressed dissatisfaction with Dr. Miller's treatment. He replied, "No, not that I am aware of."
Dr. Jacobs was aware that Dr. Miller performed two ultrasounds on Mrs. Davis, one at 24 weeks and one at 33 weeks. He understood that Dr. Miller was trying to see if any gross abnormality could be detected. However, the ultrasound could also serve to reassure Mrs. Davis if nothing abnormal was detected. Dr. Jacobs reviewed both ultrasound reports, and agreed that the fetus appeared to be normal. *730 There was nothing remarkable on Mrs. Davis' chart through delivery.
Dr. Jacobs testified that when he refers a patient to a perinatologist, he receives the report and calls his patient whether the results are normal or abnormal. If the results are abnormal, he may consult with a perinatologist first to ensure he is giving his patient accurate information.
On redirect examination, Dr. Jacobs explained that an ultrasound could detect physical abnormalities, but not mental dysfunction. Dr. Jacobs was asked if he thought one or two days was too short a time period to make a decision about terminating a pregnancy. He responded that everyone is different.
After reviewing Dr. Jacob's testimony, we agree that his testimony did not establish the standard of care for OB/GYN's performing amniocentesis tests or reporting the results. The letter from Dr. Miller to Dr. Jacobs merely summarized the events of June 28th, and indicated that results could usually be expected in about 2 1/2 weeks. Although Dr. Jacobs testified that he did not perform amniocenteses as part of his general OB/GYN practice, he admitted that he knew it sometimes took longer for the cells to grow, and that sometimes they did not grow at all, inferring that the test would have to be repeated. The form sent to Dr. Jacobs by the cytogenetics department indicated that Dr. Miller was the consulting physician. Dr. Miller or his office did not generate the report nor did Dr. Miller sign it. Dr. Jacobs testified that he relied on Dr. Miller to accurately report the test results. There is no evidence that Dr. Miller did not report the test results accurately; Dr. Miller conveyed to Dr. Jacobs the results as they were reported by the LSU cytogenetics laboratory. There was no evidence presented that Dr. Miller did the actual laboratory analysis or controlled the cytogenetics laboratory or its employees in any way. Dr. Miller did not certify that the results were accurate.
The apparent crux of plaintiffs' case is that Dr. Miller somehow caused the delay in reporting the final test results to Mrs. Davis. This delay in turn caused Mrs. Davis to have to digest the distressing news received August 14, and to make a life-altering decision in a very short amount of time. Plaintiffs did not produce any evidence in their case in chief to support these claims. Dr. Jacobs admitted that he was upset to receive the second report in August, but did not testify that he believed Dr. Miller had breached any standard of care. Dr. Jacobs also did not agree that allowing a patient only one or two days to make a decision of that magnitude breached any standard of care. Instead, Dr. Jacobs opined that all people are different.
Based on the principles set forth in La.Rev.Stat. 9:2794 A, we find that plaintiffs' failed to provide sufficient evidence to satisfy their burden of proof, and thus, reasonable persons could not reach the conclusion that Dr. Miller violated any standard of care applicable to him. Accordingly, we find that the trial court erred in denying the motion for directed verdict urged on behalf of Dr. Miller.

Conclusion:
For the foregoing reasons, we reverse the judgment of the trial court in favor of Pearl Ann Davis against the Board of Supervisors of Louisiana State University as the employer of Dr. Joseph Miller, and the judgment in favor of Wayne Davis against Dr. Joseph Miller, in his capacity as an employee of the Board of Supervisors of Louisiana State University. The remainder of the judgment is affirmed.
*731 REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
BELSOME, J., dissents with reasons.
BELSOME, J., dissenting.
I respectfully dissent. The majority opinion cites La.Rev.Stat. 9:2794(A) for the proposition that expert testimony is required to address the standard of care and breach thereof.
Expert testimony is not always needed to establish a medical malpractice claim. As stated by the Supreme Court in Pfiffnerr v. Correa:
We [the Supreme Court] hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. (emphasis added.)
Pfiffner v. Correa, 94-0924 (La.10/17/94), 94-0963 (La.10/17/94), 94-0992 (La.10/17/94), 643 So.2d 1228 .
This is such a case, a lay jury did perceive negligence based on the medical and factual issues presented. Mrs. Davis elected to undergo an amniocentesis on June 28, 1990, understanding the results would take approximately two and one half weeks. On July 11, 1990, Dr. Miller reported to Dr. Jacobs that the results were normal. The Davis' were notified of these results. It was not until August 15, 1990, approximately seven weeks later, when the Davis' were notified by Dr. Miller's office of another result that reflected a chromosome abnormality.
Several doctors gave their opinion as to the delay in ascertaining the test results. First, Dr. Jacobs testified that he did not expect to be given a follow-up report. Next, Dr. Frist went so far as to testify that he was appalled at the length of time between the initial report and the subsequent finding. Finally, Dr. Hyman testified that he would have expected more information to be given indicating that the first report was not to be relied on. Clearly, the jury had factual information which enabled them to deduce, that the Davis' had no reason to believe the July 11, 1990, report was preliminary. Each explanation led to a reasonable perception that Dr. Miller had negligently performed his duties.
Consequently, there was a permissible factual jury determination, of a breach of duty, which did not require expert testimony. I would affirm the trial court's ruling in denying the directed verdict.
NOTES
[1] Following the jury verdict, defendants, Dr. Yuan S. Kao and Terry Van Brunt, were dismissed, with prejudice, from the suit.
[2] Mr. Van Brunt is referred to as "Terry" throughout the record; however, he testified that his legal name is John Van Brunt, III.
[3] An OB/GYN is a physician who deals primarily in the care of women during pregnancy and childbirth, and in the diagnosis and treatment of disorders affecting the female reproductive organs.
[4] Amniocentesis is a diagnostic procedure in which a small sample of amniotic fluid is drawn out of the uterus through a needle inserted into the abdomen. The fluid is then analyzed to detect genetic abnormalities in the fetus or to determine the sex of the fetus.
[5] A perinatologist is sometimes referred to as a maternal-fetal specialist or high risk pregnancy doctor.
[6] A mosaic marker is a chromosome fragment that cannot be specifically identified. It is called a marker because it can be distinguished from all of the normal human chromosomes, but is not a sign of any specific disease or condition. Mosaicism occurs after fertilization indicating that neither parent carries the marker. Because of the small size of this marker (micro marker), it was difficult to determine if this was true mosaicism. Therefore, blood samples were needed from the parents to determine if either of them carried this marker, or if the marker appeared spontaneously in the fetus, i.e., was de novo.
[7] In the defendants' pre-trial inserts that were filed into the record of this case, there is a statement that the child was "born normal" and that she had met all age appropriate goals as of October 2002, when she was almost 12 years old.
[8] Defendants objected at the time the deposition was taken to plaintiffs' offering Dr. Hyman as an expert, because he was a fact witness. There was no discussion on the record as to the court's ruling on this objection at the time of trial.